**B1040 (FORM 1040) (12/24)**

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS** TIG REAPER LLC, REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC, and REAPER TIME PA 2 LLC | **DEFENDANTS**<br>BANK MIDWEST |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Kang Haggerty, 123 South Broad Street, Suite 1950 ,<br>Philadelphia, PA 19109; 215.525.5850 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach of contract, injunctive relief, tortious interference, subordination and declaratory judgment claims in connection with two loans that Defendant alleges in bad faith that Plaintiffs defaulted upon. Plaintiff seeks to protect its collateral from Defendant, which seeks to pursue the collateral for obligations owed by non-parties.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- [4] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- [1] 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
- [3] 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- [2] 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>TIG REAPER LLC | BANKRUPTCY CASE NO. 26-13937 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Eastern District of PA | DIVISION OFFICE<br>Philadelphia | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>*/s/ Edward T. Kang* | | |
| DATE<br>September 21, 2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Edward T. Kang | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re TIG REAPER LLC, *et al.*<br><br>Debtors,<br><br>TIG REAPER LLC, REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC, and REAPER TIME PA 2 LLC,<br><br>Plaintiffs,<br>v.<br><br>BANK MIDWEST, a division of NBH Bank,<br><br>Defendant. | : | Case No. 26-13937<br><br>Chapter 11<br><br>Adv. Proc. No. ___________ |

**ADVERSARY PROCEEDING COMPLAINT**

Plaintiffs TIG REAPER LLC, REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC, and REAPER TIME PA 2 LLC, through their undersigned counsel, bring this action against Defendant Bank Midwest and, in support thereof, aver as follows:

**PRELIMINARY STATEMENT**

1. This action arises out of Defendant's breach of contract, violation of the duty of good faith and fair dealing, improper attempts to seize Plaintiffs' assets to collect on debt owed by third parties, and tortious interference with a $30 million sale of those assets to interested purchasers. Plaintiffs seek damages, injunctive relief, and a declaration that Defendants have no interest in those assets or, in the alternative, that such interest is subordinated.

2. In sum, this matter concerns an aggressive lender who, acting in bad faith, manufactured (non-monetary) defaults and seized on ambiguities within its own loan documents to strongarm Plaintiffs into paying debts owed by separate businesses.

3. Plaintiffs had no obligation regarding those debts. In fact, Defendant never obtained (or even sought) a guarantee from Plaintiffs to secure the separate debts at issue.

4. Even though Plaintiffs remained current on their loan payments, Defendant purported to accelerate their loans (without providing the required notice and cure periods under the loan documents) and took the extraordinary measure of commencing litigation to appoint a receiver singularly to liquidate an otherwise going concern.

5. These actions have caused significant economic and reputational harm to Plaintiffs' business.

6. At the time of Defendant's improper interference, Plaintiffs sought to sell the business at a favorable price, more than sufficient to pay off its debts to Defendant.

7. However, Defendant's interference has undermined efforts to conduct an orderly sale, greatly reducing the value and marketability of the business.

## PARTIES

8. Plaintiff TIG REAPER LLC ("TIG Reaper") is a Delaware limited liability company with a business address of 406 Executive Dr, Langhorne, PA 19047.

9. Plaintiff REAPER TIME NJ 1 LLC is a New Jersey limited liability company with a business address of 406 Executive Dr, Langhorne, PA 19047.

10. Plaintiff REAPER TIME PA 1 LLC is a Pennsylvania limited liability company with a business address of 406 Executive Drive, Langhorne, PA 19047.

11. Plaintiff REAPER TIME PA 2 LLC is a Pennsylvania limited liability company with a business address of 406 Executive Drive, Langhorne, PA 19047. Plaintiffs REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC and REAPER TIME PA 2 LLC shall be referred to collectively as the "Reaper Time Plaintiffs."

12. Defendant is a division of NBH Bank, a Colorado corporation with its principal place of business at 7800 E Orchard Road, Suite 300, Greenwood Village, Colorado.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action pursuant to Fed. R. Bankr. P. 7001(b) as a proceeding to determine the validity, priority or extent of a lien or other interest in property; Rule 7001(g) as seeking injunctive relief; Rule 7001(h) as a proceeding to subordinate an allowed claim or interest; and Rule 7001(i) as a proceeding to obtain a declaratory judgment relating to the causes of action.

14. Venue is proper in this Court as the district in which Plaintiff TIG Reaper filed for Chapter 11 restructuring in *In re TIG Reaper, LLC*, 26-13937 (Bankr. E.D. Pa.). Fed. R. Bankr. P. 7003.

15. Plaintiffs hereby consent to the entry of final orders or judgment by this Court. *See* Fed. R. Bankr. P. 7008.

**FACTUAL BACKGROUND**

16. Plaintiffs own and operate Dave's Hot Chicken restaurants ("Restaurants") as franchisees of Dave's Hot Chicken Franchise Co., LLC ("Franchisor").

17. To pursue the development of additional Restaurants, TIG Reaper obtained two loans from Defendant:

a. A certain term loan in the principal amount of $1,650,000.00 (the "Term Loan"), as evidenced by the Term Loan A Note dated August 15, 2024 ("Term Note"). A true and correct copy of the Term Note is attached as **Exhibit 1**.

b. A certain drawdown line of credit in the principal amount of $5,000,000.00 (the "DLOC Loan," together with the Term Loan, the "Loans"), as evidenced by the DLOC Note dated August 15, 2024 ("DLOC Note," together with the DLOC

Note, the "Notes"). A true and correct copy of the DLOC Note is attached as **Exhibit 2**.

18. Contemporaneous with the Notes, Plaintiff TIG Reaper and Defendant executed a Loan Agreement, a true and correct copy of which is attached as **Exhibit 3** and a Security Agreement, a true and correct copy of which is attached as **Exhibit 4**.

19. Plaintiffs initially entered into the Loans to support the expansion of their successful restaurants.

20. As stated in the Loan Agreement, the purpose of the Term Loan was to refinance existing debt, and the purpose of the DLOC Loan was to acquire leasehold sites for new Restaurants and to develop or improve existing Restaurants. Ex. 3, §§ 1.2(b), 1.3(b).

21. The Loan Agreement further provided that that Loans were to be secured by specific collateral, to wit TIG Reaper's tangible and intangible personal property in connection with three Restaurants ("Collateral"). Ex. 3, § 1.1 and Exhibit 1.1 thereto.

22. While the first DLOC draw period was 24 months, the Loan Agreement provided for an "Accordion" whereby Plaintiffs had the right to request, subject to Defendant's sole discretion, a 24-month extension, commensurate with $3.35 million in additional financing from Defendant. Ex. 3, § 1.3(i).

23. Regarding non-monetary defaults, section 6.1 of the Loan Agreement provides:

> (d) Non-Monetary Events of Default. If any Credit Party fails to observe or perform any of the covenants, conditions, or obligations of this Agreement or any of the other Loan Documents, other than those referred to in the other subsections of this Section 6.1, and such failure continues without being fully cured for more than 30 days following written notice to such Credit Party of such failure. However, if such failure is not willful or intentional, does not place any rights or interest in any Collateral in immediate jeopardy, and is within the reasonable power of such Credit Party to promptly cure after receipt of notice thereof, all as determined by Lender in its reasonable discretion, then such failure shall not constitute an Event of Default (unless

> otherwise expressly provided) if during such 30-day period, such Credit Party begins to cure the failure and then diligently pursues the cure to completion, except that in no event will the cure period under this subsection exceed 90 days from the date such Credit Party receives the notice from Lender. If such Credit Party fails to cure such failure within the time periods provided in this subsection, an Event of Default shall be deemed to have occurred without further notice or demand of any kind being required.

24. In other words, Plaintiffs would have a minimum of 30 days, and up to 90 days, to cure a non-monetary default.

**<u>The Loan Modification</u>**

25. In November 2025, Defendant granted an extension pursuant to the Accordion to Plaintiff TIG Reaper.

26. In connection therewith, the Reaper Time Plaintiffs were joined as Additional Borrowers to the Loan Agreement through a certain Loan Assumption and First Modification Agreement dated November 14, 2025 ("Modification Agreement"). A true and correct copy of the Modification Agreement is attached as **<u>Exhibit 5</u>**. The Notes, Loan Agreement, Security Agreement and Modification Agreement shall be referred to collectively herein as the "Loan Documents."

27. The Modification Agreement increased the DLOC Loan amount by $3.35 million to a total of $8.35 million and granted Defendant a security interest in the Reaper Time Plaintiffs' tangible and intangible assets as additional Collateral subject to the Loan Documents. Ex. 5, § 3.1(a).

28. Specifically, the Modification Agreement added seven new Restaurants as Collateral, for a total of ten. Ex. 5, Exhibit 1.1 thereto; *compare* Ex. 3, Loan Agreement, Exhibit 1.1 thereto.

29. Prior to granting the Accordion, Defendant evaluated Plaintiffs' financial statements and conducted other due diligence on Plaintiff's financial condition.

**The Queso Entities**

30. Plaintiffs' owners operated a separate line of businesses that operate separate and distinct Qdoba franchises (the "Queso Entities") through non-party TIG QUESO LLC ("TIG Queso") and a series of similarly named companies.

31. Neither TIG Queso nor any of the Queso Entities are party to any of the Loan Documents.

32. TIG Queso and the Queso Entities have separate financing agreements with Defendant (collectively, the "Queso Loan Documents"), including loan(s) secured by collateral owned by those entities (the "Queso Collateral").

33. At the time of the loans to the Queso Entities, there were no discussions (much less agreements) that Plaintiffs would guarantee or post any collateral in connection with the loans to the Queso Entities.

34. Even though the agreements with the Queso Entities came well after the loans to Plaintiffs, Defendant did not request that Plaintiffs execute guaranties, cross-collateralization agreements, security agreements, or any other documents imposing obligations on Plaintiffs in connection with the loans to the Queso Entities.

35. To the contrary, Defendant only requested that a single individual owner act as a guarantor under the Queso Loan Documents.

36. Defendant has alleged events of default under the Queso Loan Documents and commenced an action against the Queso Entities, wherein the Queso Entities *consented* to the appointment of a receiver.

37. At the time of the alleged defaults by the Queso Entities in July of 2026, Defendant did not treat the alleged defaults by the Queso Entities as a breach of the Loan Documents.

**Defendant's Notice of Default, and Plaintiffs' Cure**

38. On July 13, 2026, Defendant sent a written notice to Plaintiffs asserting that Plaintiffs failed to make the regular payment due on July 1, 2026 (the "July 13 Notice") and providing the contractually required five (5) days to cure. A true and correct copy of the July 13 Notice is attached as **Exhibit 6**.

39. Notably, the July 13 Notice only raised an alleged payment default by Plaintiffs. It did not assert any event of default based on Queso Loan Documents.

40. The July 13 Notice indicates that it was sent "VIA EMAIL AND FEDEX" *Id.*

41. Per the Loan Agreement, notices must be either hand-delivered, sent by overnight delivery service, or by US Mail. Ex. 3, at §8.10.

42. The July 13 Notice is silent as to whether it was sent by overnight delivery.

43. Assuming that it was sent by overnight delivery, the Loan Agreement provides that notice was deemed received the next business day (July 14, 2026).

44. Additionally, the Loan Agreement specifies that when performance is due "on a day other than a Business Day, the time for performance or taking such action shall be extended to the next succeeding Business Day." Ex. 3. at § 8.17.

45. Accordingly, since the cure demanded in the July 13 Notice would be due on Sunday, July 19, the time was extended by the contract to July 20.

46. Unfortunately, Defendant did not wait for the cure period to expire before escalating the dispute further.

47. On July 20, 2026, Defendant notified Plaintiffs in writing of alleged defaults under the Loan Documents. A true and correct copy of the July 20, 2026 letter is attached as **Exhibit 7**.

48. Specifically, Defendant alleged that events of default occurred for:

a. Failure to maintain at least $1.5 million in liquid assets (Plaintiffs had over $1 million);
b. Failure to maintain Defendant as Plaintiffs' principal bank; and
c. Incurrence of unspecified indebtedness other than the Loans and ordinary trade debt.
d. Failure to make an installment payment for the month of July.

Ex. 7, p. 2.

49. That same day, and within the cure period, Plaintiffs made a payment to Defendant of $103,664 and thereby cured any monetary default.

50. Nowhere in the July 20 Letter did Defendant claim that the alleged default included any defaults under the Queso Loan Documents. In fact, the Queso Entities are not even mentioned.

51. Several of the alleged non-monetary defaults were also conditions known to, and accepted by, Defendant for years. Defendant's abrupt rejection of the parties' established course of performance demonstrates that those alleged defaults were merely pretextual.

52. For instance, Defendant does not operate branches in the Pennsylvania area where Plaintiff operates the Restaurants, meaning that it was known from the beginning of the relationship that Plaintiffs would have to use other institutions for their local banking needs and Plaintiffs did so for years without issue.

53. Similarly, as to the alleged failure to maintain $1.5 million in liquid assets, Plaintiffs had maintained lower levels of liquidity through the relationship with Defendant. Defendant never raised an issue in the past.

54. The next day (July 21), Plaintiffs' Counsel, Lisa Bonsall, Esquire, had a call with Defendant's counsel, Lisa Wolgast, Esquire, and Jason Wastson, Esquire to discuss the alleged defaults set forth in the July 20 letter.

55. During that call, counsel for Defendant confirmed that the bank received the payment on July 20.

56. As part of that discussion, Defendant demanded that Plaintiff sign a draconian "Forbearance Agreement." A draft of the Forbearance Agreement is attached as **Exhibit 8**.

57. Among other terms, the Forbearance Agreement required Plaintiffs to consent to the appointment of "chief restructuring officer" to oversee both Plaintiffs and the Queso Entities. Ex. 8 at § 7.

58. More importantly, the Forbearance Agreement required Plaintiffs to cross-collateralize and guarantee the performance of the Queso Loans. Ex. 8 at § 5.

59. Acquiescence to Defendant's demand would be severely damaging to Plaintiffs.

60. While the Queso Entities were facing significant challenges and poor financial performance, Plaintiffs operated healthy, *growing* businesses, with millions in equity.

61. During the July 21 call, Defendant's counsel expressly confirmed that this was a new demand and that ***the loans to Plaintiffs and the loans to Queso Entities were not cross-collateralized***.

62. This is confirmed by the plain terms of the Forbearance Agreement itself, which states:

> **Cross-Collateralization and Cross-Default**.
>
> **a.** Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, each Borrower shall and does hereby unconditionally guaranty to Lender the full and prompt payment of all of the indebtedness of each other Borrower, as and when due.
>
> **b.** While the TIG Queso Loans represents a **separate and independent obligation** of TIG Queso Borrowers and TIG Reaper Loans represent **a separate and independent obligation** of TIG Reaper Borrowers, each of the TIG Queso Borrowers and the TIG Reaper Borrowers, acknowledge

> that, in requesting that Lender forbear from enforcing its rights with respect to the Existing Events of Default, they intend (i) to guaranty the indebtedness and Obligations of each and every one of the other Borrowers, and (ii) that its property and the Collateral secures to the Lender the payment and performance of all of the Borrowers' combined obligations hereunder.

Ex. 8 at § 5 (emphasis added).

63. Obviously, if the loans involving the Reaper Entities and the Queso Entities were already cross-collateralized, there would be no reason for Defendant to insist on including such a requirement as a necessary term in the Forbearance Agreement.

64. As this sudden demand for cross-collateralization would unjustifiably divert the value of Plaintiffs' businesses to Defendant, Plaintiffs roundly rejected these demands.

65. On July 22, 2026, Defendant sent another letter reiterating alleged non-monetary breaches and, in clear bad faith, notified Plaintiffs of acceleration of the indebtedness under the Loan Documents, even though any overdue amounts had already been paid within the cure period.

66. Defendant then unreasonably demanded that Plaintiffs sign a forbearance agreement and engage a Chief Restructuring Officer *within one day* to avoid litigation. A true and correct copy of the July 22, 2026 letter is attached as **Exhibit 9**.

67. The declaration of a default and acceleration of the loan were improper and premature on their face.

68. As noted above, all payments were made within the cure period for the July 13 Notice.

69. This premature acceleration was a material breach of the Loan Documents.

70. Defendant's breach also deprived Plaintiffs of any meaningful opportunity to cure the alleged non-monetary defaults.

71. Plaintiffs again refused these unreasonable demands.

**Despite Its Prior Admission That There Was No Cross-Collateralization, Defendants Assert a Defaults under the Queso Loans**

72. On August 1, 2026, Plaintiffs made a timely monthly payment to Defendant of $105,919.

73. On August 20, 2026, Defendant notified Plaintiffs of additional alleged defaults, including:

a. lack of provision of a signed Compliance Certificate;
b. failing to provide liquidity statements for Guarantor for one quarter;
c. being low on cash, sales tax and accounts payable owed and
d. alleged failure to keep the Collateral free of liens.

A true and correct copy of the August 20, 2026 letter is attached as **Exhibit 10**.

74. Several of these new non-monetary breaches were further pretextual attempts to disguise Defendant's own misconduct.

75. For instance, prior to providing notice of any breaches, the bank refused to issue any further draws pursuant to the DLOC Loan.

76. The funding was suspended, not because of any conduct of the Plaintiffs, but due to the challenges faced by the Queso Entities.

77. As a result, the funding necessary to pay various business expenses, including the cost of construction at the Restaurants under development, was interrupted, decreasing overall liquidity and cash on hand.

78. Similarly, to complete the compliance certificate demanded, Plaintiffs requested certain information from the Defendant regarding how the loan was internally allocated between the different Reaper Entities.

79. Defendant, who had routinely provided this information in the past pursuant to the parties' course of performance, unreasonably refused.

80. In effect, Defendant prevented Plaintiffs from accurately completing the compliance certificate, using the issue to manufacture a non-monetary breach.

81. In the August 20, 2026 letter, Defendant also, for the first time, asserted a purported interest in Plaintiffs' Collateral to secure the liabilities of the Queso Entities to Defendant. Ex. 10, p. 3-4.

82. Defendant's newly found position was apparently based on boilerplate language within the Loan Documents, which are inconsistent with the bank's own admissions, the structure of the transactions, and with other provisions of the Loan Documents themselves.

83. As set forth above, Defendant's own counsel acknowledged that the loans to Plaintiffs and the loans to the Queso Entities were not cross-collateralized. This was further evidenced by the harsh Forbearance Agreement, which was intended to force these loans to be cross-collateralized after the fact.

84. Moreover, no sophisticated commercial lender would rely on tortured boilerplate language if the intent of the parties was for the Plaintiffs to guarantee the obligations of the Queso Entities.

85. Instead, they would expressly require a guarantee or similar agreement before extending any loans to the Queso Entities. To the extent the bank sought additional security for repayment by Queso Entities, it only sought a single guarantee from one individual.

86. Simply put, if the intent of the parties was to negotiate for Plaintiffs to be liable for the debts of the Queso Entities, the various agreements would expressly state as much.

87. Even the Loan Documents themselves suggest in numerous places that Plaintiffs have no obligations under the Queso Loan Documents.

88. Most notably, the Security Agreement, which is the controlling document establishing Defendant's security interest in any collateral from Plaintiff, indicates that the obligations being secured are as follows:

> 3. Secured Obligations. This security interest is given to secure the payment and performance of the Obligations, including all Indebtedness under the Note and all Obligations with respect to the Related Agreements, as such Related Agreements may be amended, restated, supplemented, extended or renewed from time to time…

Ex. 4 at § 3.

89. "Obligations" is a defined term under the Loan Agreement.

90. Specifically, "Obligations" only refers to payment or other performance owed "*by any Credit Party* to any Lender Party… arising out of, under, or in connection with any Loan Document or any Related Agreement." Ex. 3 at Exhibit 8.1, Schedule of Defined Terms (emphasis added).

91. The definition of "Credit Party" includes a Borrower (*i.e.* Plaintiffs), but it does *not* include any affiliates of a Borrower. *Id.*

92. Even if the Queso Entities were affiliates of Plaintiffs, the Queso Loan Agreements do not purport to impose any obligations on Plaintiffs.

93. Furthermore, the Modification Agreement notes that "Each Borrower is a direct, primary and **independent** obligor, and **no Borrower shall be deemed to be a guarantor**, accommodation party or otherwise secondarily liable for the Obligations. Ex. 5 at 3.7, revising § 8.25 of the Loan Agreement.

94. The language cited above indicates that the parties never intended for any of the Borrowers under the Loan Documents to be secondarily liable for the Queso Loans.

95. To the extent that any boilerplate language by Defendant suggests differently, it creates patent or latent ambiguity in the Loan Documents.

96. Regardless, the circumstances surrounding these transactions—and the bank's own admissions—make clear that the parties, including Defendant, never intended to cross-collateralize these loans.

97. Defendant's claims to the contrary are simply an opportunistic recasting of their own boilerplate language.

**Defendant's Premature Declaration of a Default Disrupts Efforts to Sell the Businesses on Favorable Terms**

98. Making Defendant's opportunistic behavior worse, Defendant inappropriately involved Franchisor in an effort to create further leverage against Plaintiffs.

99. At the time, Defendant knew that Plaintiffs sought to sell the businesses, in part by working with Franchisor to secure experienced buyers, on good economic terms.

100. Before Defendant declared a default, Plaintiff had received an offer of approximately $30 million, which would have been more than sufficient to retire Plaintiffs' debts to Defendant.

101. However, to force the Plaintiffs to pay the liabilities of the Queso Entities, Defendant took the position that Plaintiffs could not engage in a sale unless they signed the Forbearance Agreement, essentially turning over all the proceeds of a sale to Defendant.

102. When Plaintiffs resisted this effort, Defendant sent the July 22 notice purporting to accelerate the Loans ***to Franchisor***.

103. Defendant then contacted Franchisor to inquire as to its anticipated reaction if the bank tried to impose a receiver.

104. Through these discussions, Defendant falsely portrayed Plaintiffs' business as being in total distress.

105. Moreover, Defendant's conduct disrupted Plaintiffs' direct line of communication with Franchisor.

106. Particularly with the ongoing effort to sell the Restaurants, open and orderly communications with the Franchisor was critical.

107. Defendant's actions caused Franchisor to cease virtually all communication with Plaintiffs, except through counsel.

108. Word of the alleged default also spread quickly to potential buyers and immediately undermined the market for the Restaurants.

109. Upon information and belief, this included the prior offer of $30 million, which the potential buyer cut nearly in half, without explanation.

110. Further efforts to sell the businesses have been stymied by the improper defaults, deterring potential buyers or giving the appearance of a "fire sale" rather than an orderly sale of a growing business.

**Defendant sues Plaintiffs without the required 90 days to cure**

111. On September 8, 2026, Defendant filed suit against Plaintiffs in the U.S. District Court for the Eastern District of Pennsylvania (the "Lawsuit"). A true and correct copy of the Verified Complaint is attached as **Exhibit 11**.

112. Defendant's Lawsuit seeks $8,842,281.45 in accelerated payments, penalties and fees under the Notes, appointment of a receiver to take control over and sell Plaintiffs' assets, and a declaration that the Plaintiffs' assets are collateral for Queso Entities' obligations. Ex. 11, Prayer for Relief.

113. Defendant's Lawsuit does not plead that Plaintiffs have any payment default under the Loan Documents. *E.g*. Ex. 11, ¶ 25.

114. Defendant alleges Plaintiffs are in default because they allegedly failed to maintain liquid assets of at least $1.5 million together with Guarantor; failed to maintain Defendant as their principal bank; incurred unspecified indebtedness not permitted by the Loan Documents; did not provide a signed Compliance Certificate with their financial reports; failed to provide liquidity statements for the Guarantor for one quarter; have outstanding sales tax and accounts payables due; and failed to keep the Collateral free of liens. *Id.*

115. Defendant alleges that all of Plaintiffs' assets are subject to collection by Defendant to secure indebtedness owed to Defendant by the Queso Entities. *Id.* ¶ 28.

116. In the Lawsuit, Defendant seeks the appointment of a receiver on an emergent basis to control and sell Plaintiffs' assets.

117. As the loan payments were current, the basis for the supposed "emergency" was an alleged statement by Plaintiffs' counsel that, if Defendant pursued a receiver, Plaintiffs' management would "drive the value into the ground."

118. However, in keeping with the bank's overly aggressive behavior, this allegation was a mischaracterization. As Plaintiffs' counsel explained in writing on September 8, 2026, they never made that statement. That letter is attached as **<u>Exhibit 12</u>**.

119. Rather, counsel merely pointed out the well-known dynamic that the appointment of a receiver is often highly damaging to a business and can drive down the value of the company.

120. The Queso Entities experienced exactly this problem when Defendants forced a receiver on those entities.

121. Defendant's behavior makes clear that it is proceeding in bad faith, pursuing any means necessary to take all the assets of Plaintiffs' business.

122. Defendant's wrongful conduct has caused significant damage to Plaintiffs, including damaging their relationship with Franchisor, disrupting the operation of the business, and severely diminishing the sale price sought by Plaintiffs.

123. With no other option to deter Defendant's hostile behavior, Plaintiffs now seek relief from this Court and damages for the Defendant's wrongful conduct.

**COUNT I: BREACH OF CONTRACT & BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

124. Plaintiffs incorporate the foregoing averments as if fully set forth herein.

125. Plaintiffs and Defendant are parties to the Loan Agreement, which provides that Plaintiffs have 30 days after written notice thereof to cure non-monetary defaults as a matter of course. Ex. 3, § 6.1(a).

126. As noted above, Defendants unlawfully accelerated the Loan by ignoring Plaintiffs' timely loan payments.

127. The Loan Agreement further provides that any non-willful failure that does not place the Collateral "in immediate jeopardy" shall not constitute a default if Plaintiffs begin to cure the failure within 30 days and proceed to cure within 90 days. *Id.*

128. None of the defaults alleged by Defendant are for non-payment.

129. None of the alleged defaults by Plaintiffs were willful.

130. The Collateral was not and is not "in immediate jeopardy" as a result of any alleged defaults, nor does Defendant so allege in the Lawsuit.

131. Plaintiffs were entitled to 90 days (and in no instance less than 30 days) to cure the alleged defaults.

132. Instead, Defendant accelerated the loan in bad faith *two days* after sending a notice of default, even after Plaintiffs timely cured any alleged nonpayment.

133. Defendant's unlawful acceleration effectively prevented any cure of the non-monetary breaches.

134. Defendant's actions breach the terms of the Loan Documents, and also breach the duty of good faith and fair dealing implied in every contract.

135. Defendant's breaches have caused Plaintiffs at least $14 million in damages, which damages are accruing.

WHEREFORE, Plaintiffs seek judgment in their favor and against Defendant in an amount in excess of $75,000, and costs, and such other relief as this Court shall deem just and proper.

**COUNT II: TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONSHIP**

136. Plaintiffs incorporate the foregoing averments as if fully set forth herein.

137. Plaintiffs had been actively exploring the sale of the Restaurants for an amount sufficient to repay all indebtedness owed under the Loan Documents and had a reasonable probability of entering into a contractual relationship with prospective purchasers of the Restaurants, having engaged in tentative discussions with a prospective buyer concerning a sale of the Restaurants for approximately $30 million.

138. Defendant knew or should have known of Plaintiffs' efforts to sell the Restaurants and the prospective contractual relationship with the prospective buyer.

139. Plaintiffs' prospective sale was a valid and reasonably probable economic relationship, and not merely a speculative hope of future business.

140. Defendant intentionally interfered with Plaintiffs' prospective contractual relationship by, among other things, improperly declaring Plaintiffs in default, accelerating the Loans, asserting rights in Plaintiffs' assets that Defendant did not possess, threatening to take

control of and liquidate Plaintiffs' assets through a receivership, and pursuing the Lawsuit seeking appointment of a receiver to control and sell the Restaurants.

141. Defendant's conduct interfered with Plaintiffs' ability to consummate a sale of the Restaurants and substantially diminished their value to prospective purchasers.

142. As a direct and proximate result of Defendant's intentional interference, Plaintiffs have suffered damages in an amount to be proven at trial.

143. Defendant's interference was improper and without justification or privilege because, among other things, Defendant sought to exercise rights in Plaintiffs' assets to secure obligations allegedly owed by non-party TIG Queso, despite Plaintiffs' Collateral securing only Plaintiffs' obligations under the Loan Documents, and did so before Plaintiffs had been afforded the contractual opportunity to cure the alleged non-monetary defaults.

WHEREFORE, Plaintiffs seek judgment in their favor and against Defendant in an amount in excess of $75,000, together with costs, and such other relief as this Court deems just and proper.

**COUNT III: INJUNCTION AGAINST CROSS-COLLATERALIZATION**

144. Plaintiffs incorporate the foregoing averments as if fully set forth herein.

145. Defendant asserts a security interest in Plaintiffs' Collateral for liabilities owed to Defendant by TIG Queso.

146. Defendant has not yet exhausted its pursuit of TIG Queso's collateral under the relevant loan agreements.

147. Further, on or about July 21, 2026, Defendant's counsel stated to Plaintiffs' counsel that Plaintiffs' Collateral was not cross collateralized as security for TIG Queso liabilities to Defendant.

148. Plaintiffs' business is a going concern and has a market value more than sufficient to cover the indebtedness owed to Defendant.

149. Defendant's pursuit of the Collateral will result in immediate and irreparable harm to Plaintiffs in the form of loss of the Restaurants.

150. Greater injury would result to Plaintiffs from denial of the injunction than from granting it, because Defendant has separate collateral owned by TIG Queso to satisfy the debts under those separate loan agreements.

151. Injunctive relief would preserve the status quo of Plaintiffs' operating Restaurants and pursuing a sale for fair market value prior to Defendant's wrongful declaration of defaults.

152. Plaintiffs have no adequate remedy at law because liquidation of the Collateral to satisfy debts of a non-party would unjustifiably terminate Plaintiffs' businesses without cause.

153. The public has an interest in the continuity of restaurants that serve the public, and in avoiding unnecessary forfeiture or closure of such establishments.

WHEREFORE, Plaintiffs seek a preliminary and permanent injunction against Defendant's pursuit of the Collateral for obligations owed by TIG Queso, and such other relief as this Court shall deem just and proper.

## COUNT IV: DECLARATORY JUDGMENT

154. Plaintiffs incorporate the foregoing averments as if fully set forth herein.

155. Defendants should be estopped from liquidating the Collateral for liabilities of TIG Queso because on or about July 21, 2026, Defendant's counsel stated to Plaintiffs' counsel that the Collateral was not cross-collateralized as security for TIG Queso liabilities to Defendant.

156. Plaintiffs seek a declaration that the Collateral shall not be used to satisfy the debts of TIG Queso to Defendant unless and until Defendant demonstrates to this Court that Defendant has exhausted the collateral under the TIG Queso loan agreements, and only after a hearing to determine whether the Collateral properly is subject to such a security interest.

WHEREFORE, Plaintiffs seek a declaratory judgment that Defendant may not pursue the Collateral for obligations owed by TIG Queso, and such other relief as this Court shall deem just and proper.

**COUNT V: SUBORDINATION OF INTEREST**

157. Plaintiffs incorporate the foregoing averments as if fully set forth herein.

158. Defendant has an adequate remedy against TIG Queso in the form of the collateral provided in the TIG Queso loan documents.

159. Further, Defendant breached the Loan Documents and acted in bad faith by failing to give Plaintiffs the required time to cure non-monetary defaults.

160. Defendant's interest, if any, in the Collateral should be subordinated to other interests in this proceeding.

WHEREFORE, Plaintiffs seek judgment in their favor and against Defendant, subordinating Defendant's claim to the Collateral for obligations owed by TIG Queso, and such other relief as this Court shall deem just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

a) Enter judgment in their favor and against Defendant in an amount in excess of $75,000, and costs;

b) Enter an injunction against Defendant's pursuit of the Collateral for obligations owed by the Queso Entities;

c) Enter a declaratory judgment that Defendant may not pursue the Collateral for obligations owed by Queso Entities; and

d) Enter an order subordinating Defendant's claim to the Collateral for obligations owed by the Queso Entities; and

e) Such other relief as this Court shall deem just and proper.

Respectfully submitted,

**KANG HAGGERTY LLC**

Dated: September 21, 2026

*/s/ Edward T. Kang* _____
Edward T. Kang (ID# 87823)
Kyle Garabedian (ID# 319122)
Kerry Slade (ID# 310069)
Harrison Fonteix (ID# 326300)
123 S Broad St, Suite 1950
Philadelphia, PA 19109
T: 215-525-5850
F: 215-525-5860
ekang@kanghaggerty.com
kgarabedian@kanghaggerty.com
kslade@kanghaggerty.com
hfonteix@kanghaggerty.com
*Attorneys for Plaintiffs*